The People of the State of Illinois, Plaintiff-Appellee, v. John J. Falk, Defendant-Appellant.

Gen. No. 53,541.

First District, First Division.

February 2, 1970.

Short and Cervelli, of Chicago (Richard J. Short, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Thomas E. Holum, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE BURMAN delivered the opinion of the court.

The defendant, John J. Falk, was indicted on March 18, 1968, for the offenses of deviate sexual assault and indecent liberties with a child. After a bench trial, he was found not guilty of deviate sexual assault and guilty of indecent liberties with a child. He was sentenced to five years probation.

Defendant's principal contention on appeal is that the testimony of the fourteen-year-old prosecuting witness, Grant Wagner, was uncorroborated and unconvincing and his guilt was therefore not proven beyond a reasonable doubt.

Chapter 38, section 11–4 of the 1967 Ill Rev Stats states that:

> "(a) Any person of the age of 17 years and upwards who performs or submits to any of the following acts with a child under the age of 16 commits indecent liberties with a child;
>
> ". . .

"(3) Any lewd fondling or touching of either the child or the person done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the person or both."

The record discloses that Donald Wagner, the father of the boy, and the defendant moved their boats into the same boatyard where the families met in May, 1967, and became friends. Mrs. Falk, the defendant's wife, invited the boy onto their boat, and the boy, who had a troubled home life, frequently stayed with the Falks in their home on weekends. The Falks took Grant and their nephew on vacation in their boat, and gave the boy presents of a suit of clothes and a wristwatch. On one occasion the Falks had dinner at the Wagner home.

Grant Wagner testified that on February 2, 1968, the Falks took him out to dinner. They returned to the Falks' apartment about 10:30 p. m., and shortly thereafter he and the defendant retired to a bedroom with twin beds which was across the hall from the bedroom of the defendant's wife. He described an indecent act with the defendant which occurred at that time, the details of which are unnecessary to relate here. He testified further that the first incident of this nature occurred in August of 1967 in the defendant's office which was downstairs from the defendant's apartment. He said such acts occurred on eighteen different occasions. Grant related that two or three weeks after the February 2nd occasion, he next saw the defendant in his silver Cadillac car near the school where he was a safety patrol boy. The defendant told Grant that he missed him and asked Grant to phone him. Grant said that he would. He testified that he also saw the defendant several days later on the same corner.

On cross-examination, Grant testified that usually Mrs. Falk would invite him when he went to their home for the weekend, although sometimes Mr. Falk would

ask him. Occasionally Grant would call Mrs. Falk and ask if he could come see them. He spent about twelve weekends with the Falks. He addressed the Falks as "Uncle" and "Aunt." Grant said that he never said anything about the prior incidents to his parents or anyone else before February 2nd. He said that the defendant never struck him, but told him that if Grant ever told anyone, such as his parents or the police, what they had done he would say that it was Grant's idea. Later in the cross-examination, Grant said that Mr. Falk told him that if he ever told anyone about the incidents he would say that Grant was crazy and deny them. Grant said that he told the defendant about his troubles at home and said that the reason he went to visit the Falks was that he didn't have any activities at home. He once told the Falks that he wished they were his parents. Although he said that the February 2nd incident happened at 10:30 p. m. in the Falks' apartment, he admitted that he had told the grand jury that it happened that afternoon in the office downstairs. After his recollection had been refreshed, he said that it occurred after he had helped the Falks lay a carpet until about 2:00 a. m. the next morning.

The defendant, John Falk, a fifty-three year old real estate and insurance broker, testified in his own behalf. He said that he first met Grant when his wife took Grant inside their boat to show him the interior while Mr. Falk was painting the boat. He said that he didn't see Grant again until the following spring or fall. Grant would call Mrs. Falk and ask her if he could visit them because he wanted to get away from his home on weekends. He told Mrs. Falk that his mother said that he couldn't go to the Falks' home unless Mrs. Falk invited him. Mr. Falk related that Grant told him that his father was running around with a girl friend. Grant told Mr. Falk that he didn't tell his mother this because his father would probably kill him if he did. He said that

4

Grant told him about his father being abusive to him. The defendant said that he went to see Grant on February 15th or 16th because Grant hadn't called him as he would normally do once or twice a week. Grant told him that he had told his father that Mr. Falk "was looking at me." Mr. Falk said that he wanted to know what this was all about. Grant then told him that he would straighten it out. The defendant denied the charges and said that it would have been impossible for the alleged acts to have occurred in his office where the doors were always open with people entering and leaving all the time. The back of these premises are sublet and about ten employees are there all the time. On cross-examination the defendant stated that he had purchased a watch and a suit for Grant and that he treated him like a son.

The defendant's wife, Cecelia Falk, testified that the boy would call her, requesting to stay at their home on weekends. She said they gave the boy a suit and a watch for Christmas. When Grant visited them, he and Mr. Falk would sleep in the twin beds in the room across the hall from Mrs. Falk's room. She said that the door to their room was always open and that her dresser was in that room and she would have to go into the room several times. She never saw any indecent sexual act between the defendant and the boy. She said that people were going in and out of her husband's office all the time and that the subtenant had many employees working behind the office. Mrs. Falk said that the boy would come to her bedroom when she was dressing and she had to close the door and put a sweater over the keyhole. She told him that she would have to tell his father that he looked through the keyhole at her. She said that Grant lifted her dress once when she was going up the stairs. When she told him she would tell his father, he told her not to because his father would probably kill him. The prosecutor then asked Grant who had first denied it, if

he had ever lifted Mrs. Falk's dress. He then admitted it, but said that it was a joke.

Martha Brough, who lives near Grant's school, testified that she saw a gray Cadillac in front of her home on February 16, 1968, and again about three days later. She saw a boy dressed in a patrol belt approach the car and talk to the man inside. She called the police the second time she saw the car and gave them its license number. It was the defendant's car. There were also two witnesses who testified that the defendant's reputation in the neighborhood for truth and veracity and sexual morality was good.

█ It is well established that a reviewing court will not disturb a conviction for indecent liberties with a child, where the defendant denies the charge, where there is either some corroboration of the testimony of the prosecuting witness or that testimony is otherwise clear and convincing. People v. Ulrich, 30 Ill2d 94, 195 NE2d 180; People v. Kolden, 25 Ill2d 327, 185 NE2d 170. The reason given by the courts for this rule had been that this type of accusation is easily made and most difficult to defend. We have concluded that by either standard the defendant was not proven guilty beyond a reasonable doubt.

We have viewed the authorities submitted to us by the State. In People v. Finn, 12 Ill2d 76, 145 NE2d 30, the principal witness, a twelve-year-old girl, testified that she had sexual relations with the defendant at the latter's house. The defendant admitted that he knew the girl and that she had been at his house at that time, but denied ever having sexual intercourse with her. A neighbor of the defendant had, however, observed the defendant "necking" with the girl and overheard him state that he had had sexual intercourse with her. This was held to be sufficient corroboration. In People v. Gambony, 402 Ill 74, 83 NE2d 321, the forty-three-year-old defendant met the thirteen-year-old complaining witness through her girl friend. He gave them money and entertained

them in the privacy of his living quarters, which the court stated gave rise to an inference that his interest in the girls was other than platonic. He also attempted to negotiate with the girl's parents, and there was testimony that he tried to bribe the State's witnesses. In People v. Halteman, 10 Ill2d 74, 139 NE2d 286, a girl of nine told her mother what had taken place at a party given in the defendant's home for his daughter. When the mother called on the defendant to complain, he volunteered a statement concerning other instances of similar wrongdoing by him with the girl. At that time, the mother knew only of the incident at the party. The girl's accusation was thus corroborated by the defendant himself. The defendant in People v. Tappin, 28 Ill2d 95, 190 NE2d 806, was living with the girl's aunt in a common-law relationship. The girl of five testified that the defendant molested her on two occasions when she was alone at his home with him. There was substantial medical corroboration. In People v. Mueller, 2 Ill2d 311, 118 NE2d 1, the defendant agreed with the complaining witness's testimony except for the specific indecent acts. The father of the girl testified that when he confronted the defendant with the accusation he replied "give me another chance." When arrested, according to the police officer, the defendant said "Can't we talk this over? Can't we forget this?" There can be no doubt that these cases present corroboration of the testimony of minor children.

█ In the instant case, the trial judge stated that he considered the fact that the defendant had gone to see the boy on two occasions at the school—several weeks after the boy spent the weekend at the defendant's home—as corroboration of the boy's accusation. The facts, however, show that the boy considered the Falks as he would close relatives and that they treated him as if he were their son. He was frequently with Mr. and Mrs. Falk at their home for an extended period of time

with the knowledge and consent of his parents. The defendant, with his wife, openly gave the boy gifts about which his parents obviously knew. Mr. Falk did not deny his meetings at the school with Grant, and Grant did not testify that Mr. Falk asked him to change his allegation, but only that he wanted him to phone. We do not think that under these circumstances the two meetings corroborated the boy's accusation.

We do not think that the boy's accusation, standing alone, is sufficient to prove the defendant guilty beyond a reasonable doubt. The defendant denied the charges. He was fifty-three years old and had never been charged with a serious crime. It was his wife who generally invited the boy to spend the weekend at their home. She was usually present in the apartment or on the boat when Grant was there. She testified that the door to the room across the hall from her bedroom where the defendant and the boy slept was always open. Her dresser was in their room and she had to go in and out of the room several times in the morning and evening. The door to Mr. Falk's office where several of the indecent acts were alleged to have occurred was usually open and people frequently entered the office. Behind his office was an area which he sublet to a tenant with at least ten employees. It is unreasonable to believe that during the eighteen incidents testified to by the boy there would be no suspicious conduct between him and the defendant which would have alerted the boy's family, the defendant's wife or some persons who would have corroborated his allegations.

The boy's testimony included several contradictions. He told the grand jury that the last incident of February 2, 1968, occurred in the afternoon in the defendant's office. At the trial he stated that it happened in the bedroom in the defendant's apartment about 10:30 p. m. After his recollection had been refreshed, he said that it

occurred after he had helped the Falks lay a carpet until about 2:00 a. m., the morning of February 3rd. The boy also denied putting his hand up Mrs. Falk's skirt, but later admitted it after she had testified concerning the incident.

 Although the credibility of witnesses and the weight to be given their testimony is primarily a question for the trial court, a reviewing court is especially charged with the duty on a charge of indecent liberties to reverse the conviction if the evidence as a whole does not create an abiding conviction that the defendant is guilty of the crime charged. People v. Nunes, 30 Ill2d 143, 146, 195 NE2d 706, 707. We do not find the prosecuting witness' testimony to be so clear or his allegations so convincing as to prove the defendant guilty beyond a reasonable doubt without corroboration which we find to be lacking in this case. The judgment is, therefore, reversed.

Judgment reversed.

MURPHY and ADESKO, JJ., concur.